UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HUMAN EMBRYO #4 HB-A, BY AND
THROUGH EMMA AND ISABELLA
LOUISIANA TRUST NO. 1; HUMAN
EMBRYO #3 HB-A, BY AND THROUGH
EMMA AND ISABELLA LOUISIANA
TRUST NO. 1; EMMA AND ISABELLA
LOUISIANA TRUST NO. 1; AND JAMES
CHARBONNET, IN HIS CAPACITY AS
TRUSTEE OF THE EMMA AND
ISABELLA LOUISIANA TRUST NO. 1

CIVIL ACTION

VERSUS

NO. 17-1498

SOFIA VERGARA

SECTION "S" (1)

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #3) is **GRANTED**, and the case is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Remand (Doc. # 10) is **DISMISSED AS MOOT**.

## BACKGROUND

This matter is before the court on a motion to dismiss filed by defendant, Sofia Vergara. Vergara argues that this matter must be dismissed because she is not subject to personal jurisdiction in Louisiana.[1]

It is also before the court on a motion to remand this matter to the Twenty-Fourth Judicial District Court, Parish of Jefferson, State of Louisiana filed by plaintiffs, Human Embryo #4 HB-

---

[1] Vergara also argues that the case should be dismissed because this court is an improper venue, and plaintiffs failed to join all necessary parties. Those arguments, and Plaintiffs' Motion to Remand (Doc. #10), are rendered moot by this court's finding that Vergara is not subject to personal jurisdiction in Louisiana. Therefore, those issues will not be discussed.

1

A, by and through Emma and Isabella Louisiana Trust No. 1, Human Embryo #3 HB-A, by and through Emma and Isabella Louisiana Trust, No. 1, Emma and Isabella Louisiana Trust No. 1 (the "Louisiana Trust"), and James Charbonnet, in his capacity as Trustee of Emma and Isabella Louisiana Trust No. 1. Plaintiffs argue that this court lacks diversity subject matter jurisdiction under 28 U.S.C. § 1332, because the embryos, "Emma" and "Isabella", have the same citizenship as Vergara and the jurisdictional minimum amount in controversy is not satisfied. Plaintiffs also argue that this court lacks federal question subject matter jurisdiction under 28 U.S.C. § 1331, because there are no federal questions raised on the face of the state court petition.

Sofia Vergara, a citizen of California, is an actress and model. On January 17, 2010, she met Nicholas Loeb in West Hollywood, California. Loeb is a citizen of Florida, who also has an apartment in New York City. Vergara and Loeb embarked on a romantic relationship. They saw each other primarily in California, Florida and New York, staying at each other's residences. On July 10, 2012, while they were in Mexico, Vergara and Loeb became engaged to be married.

In early 2013, Vergara and Loeb contracted with ART Reproductive Center, Inc. in Beverly Hills, California to undergo in vitro fertilization ("IVF") in an attempt to create biological children that would be carried to term by a gestational surrogate. Vergara and Loeb selected a friend and employee of Vergara to be the surrogate and entered into a Gestational Surrogate Parenting Agreement with her. Then, Vergara and Loeb underwent the IVF process, which resulted in several pre-embryos. After genetic testing was performed on the pre-embryos, it was determined that only two of the pre-embryos were viable. On two separate occasions, attempts were made to implant one of the pre-embryos into the surrogate's uterus. Both attempts were unsuccessful.

In the summer of 2013, Vergara and Loeb met in Los Angeles, California with a representative from a surrogacy agency to discuss finding another gestational surrogate. Loeb

claims that he, Vergara and the agency signed a "Surrogacy Program Retainer Agreement." The agency presented two candidates to Vergara and Loeb. On June 24, 2013, Vergara told Loeb by email that she wanted to meet both candidates in person. That same day, Loeb sent an email to the agency indicating that he and Vergara planned to meet the surrogacy candidates in August 2013, when he and Vergara would both be in California.

In November 2013, Vergara and Loeb signed another contract with ART in California to undergo another round of IVF. On November 16, 2013, Vergara and Loeb met with staff at ART and signed a "General Informed Consent for Procedures Involved in In Vitro Fertilization," which included the "Directive for Partners Regarding the Storage and Disposition of CryoPreserved Materials Which May Include Embryos" (the "Form Directive"). Loeb claims that the documents were signed on the same day that they were presented to him and Vergara, and that neither he nor Vergara was able to consult legal counsel or modify the documents.

The Form Directive provided three options for the embryos in the event of Vergara's and/or Loeb's death: (1) donate the embryos to research; (2) thaw the embryos with no further action; or, (3) if one party died, allow the embryos to be used by the living partner. According to Loeb, Vergara forced him to choose option number 2. The Form Directive requires both parties to consent to uterine transfer of the pre-embryos.

The November 2013 IVF procedure resulted in several pre-embryos. However, genetic testing of the pre-embryos revealed that only two were viable. Because Loeb and Vergara had not chosen another surrogate, the two viable female pre-embryos were cryopreserved at ART in California, where they remain. Loeb named these pre-embryos "Emma" and "Isabella."

According to Vergara, in March 2014, she and Loeb began discussing ending their relationship. She claims that they spent several weeks together in April 2014, in Florida where they saw a therapist and agreed to end their relationship.

From May 1, 2014, until July 4, 2014, Vergara rented a house in New Orleans, Louisiana where she was filming a movie. On May 3, 2014, Vergara and Loeb attended the White House Correspondents Dinner together as they had previously planned. At that time, Loeb asked Vergara if he could stay with her in New Orleans while he did his first stint as a volunteer deputy at the Plaquemines Parish Sheriff's Office. Vergara claims that she and Loeb arrived in New Orleans on May 7, 2014, and resided together until Loeb left on May 12, 2014. Vergara claims that there was no argument or discussion, and they publically announced their breakup on May 23, 2014. Loeb returned to New Orleans in June 2014, in a failed attempt to reconcile with Vergara.

Loeb recounts the events surrounding the breakup differently. Loeb claims that he and Vergara argued about their relationship on May 12, 2014, and that they were in communication as he drove to the Louis Armstrong New Orleans International Airport on May 13, 2014, where their relationship ended. Loeb asserts that, even after the relationship ended, he repeatedly attempted to communicate with Vergara about the pre-embryos and his desire to have them transferred to a surrogate for further development, but she was unwilling to allow it. Loeb also claims that he asked Vergara to confirm that the pre-embryos would not be destroyed, to allow the surviving person to have custody if the other should die, or to give him full custody, and Vergara has refused all of the above.

Vergara claims that Loeb did not bring up the subject of the pre-embryos when their relationship ended, and that she does not recall having any conversations with him about the pre-embryos while she was in Louisiana. According to Vergara, in September 2014, she received a

telephone message from a lawyer representing Loeb asking for her attorney's contact information, but she did not respond. Vergara was in New York at the time, and texted Loeb to ask why the lawyer contacted her. She met with Loeb, who for the first time, brought up the pre-embryos. Vergara was surprised that Loeb wanted to try to bring the pre-embryos to term, and told him that she wanted them to remain cryopreserved.

In August 2014, Loeb sued Vergara and ART in California state court seeking a court order allowing Loeb to try to bring the pre-embryos to term without Vergara's consent. Loeb alleged that venue was proper in California because the acts and omissions giving rise to the case occurred in California. Loeb also alleged and stated in answers to interrogatories that the oral agreement between him and Vergara to create the pre-embryos occurred in Californian, and that related discussions occurred in New York. Loeb testified that he ended his relationship with Vergara in Florida, and that Vergara told him at his apartment in New York that she did not want the embryos to continue developing.

On November 30, 2016, Loeb created the Louisiana Trust. On December 5, 2016, Loeb modified the Louisiana Trust to benefit "Emma" and "Isabella" if they are born alive.

On December 6, 2016, Loeb dismissed the California case. On December 7, 2016, Loeb directed that this suit be filed in the Twenty-Fourth Judicial District Court, Parish of Jefferson, State of Louisiana. Louisiana has the most favorable state laws regarding the rights pertaining to IVF created embryos, which make them juridical people that have the right to sue and be sued and cannot be intentionally destroyed. See La. Rev. Stat. § 9:121, *et seq*. The plaintiffs in this suit are the pre-embryos, "Emma" and "Isabella"; the Louisiana Trustee; and, James Charbonnet, in his capacity as Trustee of the Louisiana Trust. The relief plaintiffs seek is:

> (1) a declaratory judgment declaring that the Form Directive is a void and unenforceable contract between Loeb and Vergara under California law because it

does not contain certain required provisions pertaining to the disposition of the pre-embryos under certain circumstances;

(2) a declaratory judgment declaring that the Form Directive does not control decisions regarding the future disposition of Emma and Isabella in the event of Loeb and Vergara's separation because it lacks such provisions, which are required by California law;

(3) rescission of the Form Directive because Loeb signed it under duress;

(4) rescission of the General Informed Consent as against public policy and Louisiana law because it declares that the pre-embryos are property instead of people;

(5) rescission of the Form Directive for fraud and misrepresentation because, at the time the pre-embryos were created through the IVF process, Loeb was relying on Vergara's representations that she wanted them to be transferred to a surrogate;

(6) declaratory judgment prohibiting Vergara from consenting to the pre-embryos' destruction;

(7) declaratory judgment mandating that Vergara release the pre-embryos for uterine transfer;

(8) finding a breach of an oral contract between Loeb and Vergara to have the pre-embryos transferred to a surrogate which has prevented them from being born and gaining their inheritance in the Trust;

(9) finding of tortious interference with the pre-embryos' ability to inherit from the Trust by not permitting them to be transferred to a surrogate;

(10) appointment of Loeb as the pre-embryos' curator;

(11) an order declaring Vergara to be an egg donor under California law; and,

(12) an order terminating Vergara's parental rights.

On February 21, 2017, Vergara removed this action to the United States District Court for the Eastern District of Louisiana alleging diversity and federal question matter jurisdiction under 28 U.S.C. §§ 1332 and 1331, respectively. Plaintiffs filed a motion to remand arguing that neither type of subject matter jurisdiction is present. Also, Vergara filed a motion to dismiss arguing that she is not subject to personal jurisdiction in Louisiana.

## ANALYSIS

**I.      Order of Deciding Personal and Subject Matter Jurisdiction Questions**

Jurisdiction is the bedrock of a federal court's authority to adjudicate the merits of a controversy. Ruhrgas AG v. Marathon Oil Co., 119 S.Ct. 1563, 1566 (1999). For a court's decision to be binding, it must have "authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction)." Id. The Supreme Court of the United States has held that "there is no unyielding jurisdictional hierarchy[,]" and courts have discretion in which order to determine questions of personal or subject matter jurisdiction. Id. at 1567. Ordinarily, subject matter jurisdiction will not involve an arduous inquiry, and the court should resolve it first considering "expedition and sensitivity to state courts' coequal stature." Id. at 1572. However, if a challenge to the court's subject matter jurisdiction is not easily resolved because it raises a difficult and novel questions, and the personal jurisdiction issue is straightforward "presenting no complex question of state law," the court should consider personal jurisdiction first. Id. The United States Court of Appeals for the Fifth Circuit has interpreted Ruhrgas to direct

> courts facing multiple grounds for dismissal to consider the complexity of subject-matter jurisdiction issues raised by the case, as well as concerns of federalism, and of judicial economy and restraint in determining whether to dismiss claims due to lack of personal jurisdiction before considering challenges to its subject-matter jurisdiction.

Alpine View Co. Ltd. v. Atlas Copoco AB, 205 F.3d 208, 213 (5th Cir. 2000).

In this case, the personal jurisdiction issue is straightforward, whereas the subject matter jurisdiction inquiry poses difficult and novel questions. Determining whether this court has diversity subject matter jurisdiction would require an analysis of the citizenship of pre-embryos. Louisiana Revised Statutes § 9:124 provides that an IVF human ovam is a juridical person that has the right to sue and be sued. Plaintiffs argue that the pre-embryos are citizens of California,

7

because they were created and are stored in California, and their mother, Vergara, is a citizen of California. Vergara argues that pre-embryos are not people and consequently, do not acquire citizenship until they are born. The diversity subject matter jurisdiction analysis in this case also would require assessing the value of the pre-embryos' lives to determine the amount in controversy. The federal question subject matter jurisdiction analysis raises constitutional questions concerning procreation rights, and whether federal law preempts the Louisiana laws conferring rights on IVF created embryos. See La. Rev. Stat. § 9:121, *et seq.* There is also a question of whether the Louisiana laws regarding IVF created embryos apply to pre-embryos that were not created, and are not stored, in Louisiana. On the other hand, it is straightforward that Vergara is not subject to personal jurisdiction in Louisiana. Thus, personal jurisdiction will be considered first, and it is unnecessary to consider subject matter jurisdiction.

## II. Vergara's Motion to Dismiss for Lack of Personal Jurisdiction

Personal jurisdiction "is an essential element of the jurisdiction of a district court, without which it is powerless to proceed to an adjudication." Ruhrgas, 119 S.Ct. at 1570. Rule 12(b)(2) of the Federal Rules of Civil Procedure provides that a defendant can move to dismiss an action against her for lack of personal jurisdiction. "The plaintiff bears the burden of establishing [personal] jurisdiction but is required to present only *prima facie* evidence." Seiferth v. Helicopteros Attuneros, Inc., 472 F.3d 266, 270 (5th Cir. 2006). The allegations of the complaint, except as controverted by opposing affidavits, are taken as true and all factual conflicts are resolved in the plaintiff's favor. Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985). In resolving a motion to dismiss for lack of personal jurisdiction, the court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." Revell v. Lidov, 317 F.3d 467, 469 (5th Cir. 2002) (quotations omitted).

Personal jurisdiction over a non-resident defendant is determined by the state's long-arm statute and the Due Process Clause. ICEE Distrib., Inc. v. J&J Snack Foods, 325 F.3d 586, 591 (5th Cir. 2003). Because Louisiana's long-arm statute extends to the limits of the Due Process Clause of the Fourteenth Amendment, the inquiry is whether subjecting a defendant to personal jurisdiction in Louisiana would offend due process. See Dickson Marine Inc. v. Panalpina, Inc., 179 F.3d 331, 335 (5th Cir. 1999). Due process is not offended if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 66 S.Ct. 154, 158 (1945) (internal quotation and citation omitted).

Personal jurisdiction may be either specific jurisdiction or general jurisdiction. "General jurisdiction allows a court to exercise personal jurisdiction generally based on any claim, including claims unrelated to the defendant's contacts" with the forum state. James M. Wagstaffe, Practice Guide: Federal Civil Procedure Before Trial, § 10-V (2017). A court has general jurisdiction over a nonresident defendant "to hear any and all claims against [her] when [her] contacts with the state are so 'continuous and systematic' as to render [her] essentially at home in the forum." Daimler AG v. Bauman, 134 S.Ct. 746, 761 (2014) (quotations omitted). The "test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V., 249 F.3d 413, 419 (5th Cir. 2001). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile. . ." Goodyear Dunlop Tires Operations v. Brown, 131 S.Ct. 2846, 2853-53 (2011).

Specific jurisdiction exists when a nonresident defendant "has purposefully directed its activities at the forum state and litigation results from alleged injuries that arise out of or relate to those activities." Panda Brandywine Corp. v. Patomac Elec. Power Co., 253 F.3d 865, 868 (5th

9

Cir. 2001) (quotations omitted). In evaluating specific jurisdiction, courts "consider the defendant's contacts with the forum state as they relate particularly to the claims for relief asserted in the litigation." James M. Wagstaffe, Practice Guide: Federal Civil Procedure Before Trial, § 10-VII (2017). Actions, or a single act, by a nonresident defendant whereby it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[,]" can establish minimum contacts. Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2183. (1985) (citations and footnotes omitted). "The non-resident's purposeful availment must be such that the defendant should reasonably anticipate being haled into court in the forum state." Ruston Gas Turbines, Inc. v. Donaldson Co., Inc, 9 F.3d 415, 419 (5th Cir. 1993). "The purposeful availment inquiry is intended 'to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state.'" James M. Wagstaffe, Practice Guide: Federal Civil Procedure Before Trial, § 10-VII (2017) (quoting A Corp. v. All Am. Plumbing, Inc., 812 F.3d 564, 60 (1st Cir. 2016)). Further, "[t]he focus in analyzing the purposeful availment requirement is on the defendant's contacts with the forum state, not on fortuitous contacts the defendant might have with plaintiff who happens to be in the forum state." Id. (citations omitted). "The unilateral activity of [a plaintiff] who claim[s] some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." Pervasive Software Inc. v. Lexware GmbH & Co. KG, 688 F.3d 214, 222 (5th Cir. 2012).

The United States Court of Appeals for the Fifth Circuit applies a three-step analysis to determine specific jurisdiction:

> (1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or result from the defendant's forum-related

> contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

Seiferth, 472 F.3d at 271. "If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." Id. In conducting the fairness inquiry, the court examines "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." Luv N' Care Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 473 (5th Cir. 2006).

Vergara argues that she is not subject to general or specific jurisdiction in Louisiana. Vergara states in her affidavit that she does not have continuous and systematic contacts with Louisiana. She is a citizen of, and works primarily in, California. She does not own any property, nor does she regularly work or conduct business, in Louisiana. Vergara was in Louisiana from April 8 to 15, 2013, while working on a movie. Vergara rented a house in Louisiana from May 1, 2014, to July 4, 2014, when she was filming a movie in New Orleans. Also, she has visited Louisiana for two or three days at a time to attend events for work. Vergara states that her relationship with Loeb ended before they arrived in Louisiana in May 2014. According to Vergara, all significant events regarding the creation of the pre-embryos occurred at ART in California, such as signing the contracts and her and Loeb actually undergoing the procedure. Vergara states that she and Loeb did not have any conversations regarding the pre-embryos while they were in Louisiana.

Loeb claims that Vergara has continuous and systematic contacts with Louisiana. He claims that the following contacts give rise to general jurisdiction over Vergara in Louisiana: Vergara filmed two movies in Louisiana, filmed a Louisiana-produced movie in Florida, worked

11

at a Super Bowl in Louisiana, attended various events and family vacations in Louisiana, and met her current husband in Louisiana. Loeb also argues that Vergara is subject to specific jurisdiction in Louisiana because:

> Loeb and Vergara dated in Louisiana, planned their future in Louisiana, planned the future of their children in Louisiana, granted one another the irrevocable right of parenthood through their oral agreement in Louisiana to conceive children via in vitro fertilization ("IVF") and the subsequent follow-through on that agreement while in California due to Vergara's current work in that state, and most importantly, terminated their relationship in Louisiana, in part caused by disagreement over plans for their daughters and furthermore the cause of Vergara deciding not to transfer their daughters to a uterus where they can continue to develop, which will ultimately result in the girls' destruction.

Vergara points out that these statements contradict Loeb's discovery responses in the California litigation where he stated that the alleged oral contract to engage in the IVF procedure was entered into in California and discussed in New York. It also contradicts Loeb's deposition testimony where he stated that his relationship with Vergara ended in Florida.

Vergara is domiciled in California. Her contacts with Louisiana consist of visiting the state for short periods over a couple of years for work-related activities or vacations. There is no indication that Vergara's work-related activities in Louisiana were all connected to each other so that she could expect to be in Louisiana regularly. Rather, her visits to Louisiana were sporadic, and not continuous and systematic. Thus, Vergara is not subject to general jurisdiction in Louisiana.

Further, Vergara is not subject to specific jurisdiction in Louisiana. Plaintiffs' claims against Vergara stem from the IVF procedure and related contracts that Vergara and Loeb entered into in California. Conversations that allegedly occurred in Louisiana regarding the pre-embryos do not establish minimum contacts by Vergara of purposefully availing herself of the privilege of

12

conducting activities within the forum State, thus invoking the benefits and protections of its laws. There is no indication that Vergara and Loeb were in Louisiana together for any significant amount of time prior to the November 2013 IVF procedure. Vergara and Loeb underwent the IVF procedure in California and invoked California laws regarding that transaction. Obviously, any meaningful planning for the IVF procedure and the granting of the "right of parenthood" occurred in connection with undergoing the IVF procedure and signing the related contracts in California. The causes of action alleged in the complaint regarding the pre-embryos do not arise out of Vergara's contacts with Louisiana, which pertain to her work as an actress. Therefore, she is not subject to specific personal jurisdiction in Louisiana. Because Vergara is not subject to personal jurisdiction in Louisiana, her motion to dismiss is GRANTED, and this matter is DISMISSED.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. #3) is **GRANTED**, and the case is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Remand (Doc. # 10) is **DISMISSED AS MOOT**.

New Orleans, Louisiana, this __25th__ day of August, 2017.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**